UNITED STATES of America,

v.

Tuere BARNES, Defendant.

No. 04 CR 186–3(LAP).

United States District Court,
S.D. New York.

Signed Nov. 25, 2014.

David Noel Kelley, Andrew Seth Dember, U.S. Attorney's Office, John Michael Hillebrecht, DLA Piper U.S. LLP, New York, NY, Douglas Benjamin Bloom, U.S. Attorney's Office, White Plains, NY, for United States of America.

Alexander Edward Eisemann, Eisemann Law Office, Katonah, NY, Jasmine Edwards, Edwards & Greenidge L.L.P., Brooklyn, NY, for Tuere Barnes.

## MEMORANDUM & ORDER

LORETTA A. PRESKA, Chief Judge:

Tuere Barnes ("Barnes" or "Defendant") moves for a new trial pursuant to Fed.

R.Crim.P. 33. In 2009, a jury convicted Barnes of seven offenses involving racketeering, narcotics distribution, kidnapping, conspiracy to murder, and use of a firearm. Three years later he filed the instant motion, arguing that new evidence from an individual who was incarcerated with two of the Government's witnesses merits a new trial. Specifically, he asserts that a declaration from that individual proves that the two witnesses perjured themselves when testifying about their interactions with each other.

For the reasons below, Defendant's motion is denied.

## I. *Background*

Beginning in the late 1990s, Barnes was a member of a narcotics trafficking enterprise, known as the "Barnes Brothers Organization," through which Barnes, his brothers Khalid and Dawud Barnes ("Khalid" and "Dawud"), an individual named Bryan Conklin ("Conklin"), and other members distributed crack cocaine, powder cocaine, and marijuana. In furtherance of that enterprise, Organization members engaged in a number of violent acts.

At the crux of the present motion is the November 2003 kidnapping and attempted murder of Eddy Solano–Herrera ("Solano–Herrera")/ an employee of a local drug dealer named Choco, who Barnes, Khalid, Dawud, and Conklin conspired to rob. After setting up a cocaine deal with Choco, those four drove to his apartment in Yonkers with guns and latex gloves. When Solano–Herrera arrived, the group attacked him and searched him for drugs or the keys to Choco's apartment. When they found neither, the four men decided to drive Solano–Herrera to Yonkers Raceway and kill him. Barnes and Dawud took Solano–Herrera into a car, which Barnes drove while Dawud guarded Solano–Herrera in the back seat. Before the group reached Yonkers Raceway, however, Solano–Herrera leapt from the moving car and managed to escape.

In 2004, Barnes and several co-defendants were charged in a one-count indictment related to the Organization. (Indictment dated Feb. 27, 2004 [dkt. no. 1].) Barnes and three codefendants were subsequently charged in a

38–count superseding indictment related to that enterprise. (Superseding Indictment dated Aug. 7, 2006 [dkt. no. 235].) In 2009, Judge Stephen C. Robinson presided over Barnes' jury trial on sixteen of those counts. The jury convicted Barnes of seven offenses, including racketeering, conspiracy to distribute narcotics, kidnapping and conspiracy to commit kidnapping, conspiracy to commit murder, and using a firearm in relation to a violent crime. (*See* Judgment dated Aug. 5, 2010 [dkt. no. 575].)

The violent offenses of which Barnes was convicted all stemmed from the kidnapping and attempted murder of Solano–Herrera. At trial, the two key Government witnesses regarding that event were Conklin and Solano–Herrera, both of whom testified pursuant to cooperation agreements. To bolster these witnesses' testimony, the Government offered recordings of Barnes discussing the kidnapping and telephone records showing that he called a taxi service in the Bronx near the scene of the kidnapping on the afternoon it took place. During the Government's case, both Conklin and Solano–Herrera admitted that they were incarcerated in the same housing unit prior to trial. Solano–Herrera also testified that he discussed the trial date with Conklin but otherwise avoided conversations with him because of his participation in the kidnapping and attempted murder. (Trial Tr. at 1849–51.)

Barnes' defense largely hinged on the credibility of Conklin and Solano–Herrera. To that end, Defendant's attorney conducted extensive cross-examination of both witnesses, during which he delved into the extent of their communications and opportunities to interact while incarcerated together. This line of questioning resulted in concessions from Conklin that he and Solano–Herrera had "a lot of contact" when they were in the same unit for "about a year," during which were able to speak with each other, though Conklin denied being friendly or having specific conversations with Solano–Herrera. (*Id.* at 787–88; *see also id.* at 1149–50.) The defense also elicited from Solano–Herrera that he did not immediately request to be moved out of Conklin's unit, despite his role in the kidnapping and attempted murder.

(*Id.* at 1913.) Beyond pointing out both witnesses' opportunities to communicate prior to trial, Defendant's attorney significantly undermined their credibility by eliciting that Conklin had previously aided another in committing perjury, pointing out both witnesses' criminal history, and arguing that as cooperators both had motive to align their testimony. (*See id.* at 1280–82, 3633.) To further combat the Government's case, Barnes took the stand and testified that he was attending class in Westchester County during the time of the kidnapping and called the taxi service from his school after Dawud called asking for help leaving the Bronx. Despite this vigorous defense, the jury convicted Barnes of all charges related to the Solano–Herrera kidnapping and attempted murder.

Nearly three years after his conviction, Barnes filed the instant motion for a new trial based on new evidence consisting of a declaration by a former inmate named Adhurim Muriqui ("Muriqui"). (Decl. of Adhurim Muriqui ("Muriqui Decl.") dated Aug. 2, 2010 [dkt. no. 615].) According to the declaration, Muriqui was incarcerated with Conklin and Solano–Herrera in the Putnam County Jail for approximately six months prior to Defendant's trial. During that time, Muriqui, Conklin, and Solano–Herrera were "part of a group of about seven inmates who played poker together almost every day" and who "frequently played basketball together after the daily poker games ended." (*Id.* ¶ 5.) The declaration describes Conklin and Solano–Herrera as "very friendly" toward each other and states that Muriqui was surprised to learn from another inmate that Conklin had kidnapped Solano–Herrera prior to their incarceration. (*Id.* ¶¶ 6–7.) Barnes argues that this declaration reveals that Conklin and Solano–Herrera perjured themselves when testifying about their interactions in jail, which justifies a new trial.

## II. *Applicable Law and Standard of Review*

Rule 33 grants a district court discretion to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CR. P. 33(a). Motions based on new evidence are only granted "*in the most extraordinary circumstances.*" *United States v. Parkes,* 497 F.3d 220, 233 (2d Cir.2007) (emphasis in original) (quoting *United States v. Spencer,* 4 F.3d 115, 118 (2d Cir.1993)) (internal quotation mark omitted). Indeed, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant a new trial. *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992).

With these principles in mind, a Rule 33 motion based on new evidence will only be granted if (1) the evidence could not have been discovered with due diligence at or before the time of trial, and (2) it is sufficiently material and not cumulative of other evidence presented at trial that its admission would probably result in acquittal. *See Parkes,* 497 F.3d at 233; *United States v. Zagari,* 111 F.3d 307, 322 (2d Cir.1997). As a general rule, "impeachment evidence is *not* material, and thus a new trial is *not* required" if the new evidence "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Parkes,* 497 F.3d at 233 (emphasis in original) (quoting *United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996)) (internal quotation mark omitted).

Where new evidence is alleged to show perjury, the defendant must further demonstrate that the witness "in fact committed perjury." *United States v. Monteleone,* 257 F.3d 210, 219 (2d Cir.2001). In that context, "[d]ifferences in recollection alone do not add up to perjury." *Sanchez,* 969 F.2d at 1415 (citing cases). Indeed, "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino,* 59 F.3d 353, 365 (2d Cir.1995); *see also Monteleone,* 257 F.3d at 219 ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."). If newly discovered evidence reveals that a witness did indeed perjure himself, then the applicable standard for a Rule 33 motion depends on whether the prosecution was aware of that perjury. Here, Defendant concedes that the prosecution was unaware of

any perjury,[1] and a new trial may therefore only be granted if "the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* (alteration in original) (quoting *United States v. Wallach,* 935 F.2d 445, 457 (2d Cir.1991)). In considering this standard, the Court of Appeals for the Second Circuit has "frequently acknowledged that, even where newly discovered evidence indicates perjury, motions for new trials 'should be granted only with great caution and in the most extraordinary circumstances.'" *United States v. Stewart,* 433 F.3d 273, 296 (2d Cir. 2006) (quoting *Sanchez,* 969 F.2d at 1414).

### III. *Discussion*

■ Applying these standards to Defendant's motion, the Court assumes without deciding that the Muriqui Declaration is indeed new and could not have been discovered even with diligent efforts at or before the time of trial.[2] Even granting this point, however, the declaration, which asserts that Conklin and Solano–Herrera misrepresented the nature and extent of their interactions in jail, is wholly aimed at the two witnesses' credibility and thus cumulative of the thorough impeachment evidence that Defendant's counsel presented at trial. (*See* Trial Tr. at 3633.) Indeed, Defendant acknowledges that Conklin was utterly discredited during trial, (*see* Reply at 10–17), and it is clear that counsel made comparable efforts to impeach Solano–Herrera. (*See* Trial Tr. at 1910–14, 3633.)

The only new information that the declaration offers is an alternate characterization of Conklin's and Solano–Herrera's relationship while incarcerated. Testimony at trial already revealed that the two spent months housed together, had the opportunity to speak, and did in fact speak about Defendant's trial. (*See id.* at 787–88, 1149–50, 1849–51.) At most, the declaration demonstrates that the witnesses downplayed the extent of their interactions and friendliness. It does not suggest that they further discussed the trial or intentionally aligned their testimony. Nor does it address the facts of the kidnapping and Defendant's participation in it. Such cumulative impeachment evidence is not material and does not justify a new trial. *See Parkes,* 497 F.3d at 233. This is especially so where the Government presented corroborating evidence—recorded conversations and telephone records—of Defendant's participation in the kidnapping and attempted murder. *See United States v. Diaz,* 176 F.3d 52, 107–08 (2d Cir.1999).

Defendant's attempts to salvage his motion by pointing to a heightened perjury standard are unpersuasive. As an initial matter, he cannot show that either Conklin or Solano–Herrera committed perjury. Though the declaration may be inconsistent with the way both characterized their interactions, mere "inconsistencies in testimony do not rise to the level of perjury." *Monteleone,* 257 F.3d at 219. Muriqui's competing description of their relationship as "very friendly" and his more detailed account of the group activities in which they participated do not directly contradict either witness's testimony. (Muriqui Decl. ¶ 6.) During trial, neither Conklin nor Solano–Herrera was asked about his specific activities in jail, and Muriqui does not identify any specific conversations that the two had but failed to disclose at trial. Though the declaration undermines Conklin's and Solano–Herrera's characterization of their interactions, it does not prove that either perjured himself.

---

1. Although Defendant's initial memorandum of law argued that the Government was or should have been aware of the alleged perjury, his reply memorandum explicitly rescinded that argument. (*See* Reply Memorandum of Law in Support of Motion for New Trial ("Reply") at 3 n. 1 [dkt. no. 622].)

2. The Government argues that Barnes could have discovered this evidence in time for trial, especially because his defense focused on Conklin's and Solano–Herrera's time together in jail.

Defendant responds that he was unaware of Muriqui at the time of trial and could not be expected to interview every inmate who overlapped with Conklin and Solano–Herrera in hopes of uncovering helpful testimony. While the Court is skeptical that locating a witness who observed Conklin's and Solano–Herrera's interactions would have required the herculean efforts Defendant implies, it is unnecessary to decide the issue, as the remaining factors all weigh against awarding a new trial.

Even if the declaration did reveal that both witnesses committed perjury, however, it still would not merit a new trial. As discussed above, the declaration is cumulative impeachment evidence and does not speak to any of the material issues at trial. Although perjury regarding the extent of their interactions lends support to the argument that Conklin and Solano–Herrera colluded in forming their testimony, Defendant presented plenty of evidence to raise that theory at trial. Pointing out that the two lied about playing basketball and poker together might add color to this argument, but without more, it seems unlikely to become the lynchpin of an acquittal. Accordingly, even if Conklin and Solano–Herrera perjured themselves—which the Court finds they did not—the declaration fails to engender "a firm belief" that absent the perjury, Barnes would have been acquitted. *Monteleone,* 257 F.3d at 219 (quoting *Wallach,* 935 F.2d at 457). Simply put, this case is not one of the "extraordinary" situations in which newly discovered evidence merits a new trial. *Stewart,* 433 F.3d at 296 (quoting *Sanchez,* 969 F.2d at 1414).

## CONCLUSION

For the foregoing reasons, Defendant's motion for a new trial [dkt. no. 614] is denied.

SO ORDERED.